### SWEET, *et al.*, v. BOYD, *et al.*
(Filed February 18, 1898.)

1. GREER COUNTY—*When Made Part of Oklahoma.* By the act of congress, approved May 2, 1890, creating the Territory of Oklahoma, the territory now comprising the county of Greer was included within the boundaries of Oklahoma Territory and made a part of the Territory. The grant of such territory being, by the 25th section of said act of congress, subject to be defeated by a decision of the supreme court of the United States, adverse to the United States, in a controversy between the United States and the state of Texas, concerning the title to and jurisdiction over the lands in said county; such controversy having been decided by the supreme court in favor of the United States; such decision, in effect, related back to the date of the act of May 2, 1890, and made said lands a part of Oklahoma from that date. Although such decision was not made until March 16, 1896, and although the said act of congress provided that it should not apply to said Greer county until the title to the lands in said county had been so adjudicated and determined, such lands, under said decision, and said act of congress, were, in fact, in

Oklahoma, and a part thereof on the 1st day of February, 1896. Notwithstanding that the laws of Oklahoma were not operative in said Greer county until the said 16th day of March, 1895, property situated in said county on the 1st day of February, 1896, was in the Territory of Oklahoma on that date and might be subjected to taxation for the year 1896, under the laws of the Territory, which were suspended pending the controversy between the United States and Texas, which suspension ceased immediately upon the judicial determination of such controversy.

2. TAXATION—*Equitable Relief From.* Where a party invokes the powers of a court of equity to relieve from the payment of a tax, he must not only show that there has been a departure in manner or time from the proceedings provided for the assessment, levy or collection of the tax, or an omission in the procedure, but he must show that such departure or omission affects the ground work and substance of the procedure and affects the justice or merits of the claim on the part of the public, and injuriously affects his substantial rights. A court of equity will not lend its aid, by injunction, to restrain the collection of taxes because of mere irregularities in the tax proceedings, which did not injure the substantial rights of the plaintiff.

(Syllabus by the Court.)

*Error from the District Court of Greer County; before James R. Keaton, District Judge.*

*J. F. Matthews & J. A. Powers; H. S. Cunningham, Attorney General,* of counsel, for plaintiffs in error.

*Garrett & Thacker* and *Horace Speed,* for defendants in error.

Opinion of the court by

TARSNEY, J.: The defendants in error were, on the 1st day of February, 1896, the owners and in possession of cattle and other personal property, then situated in the county of Greer, which was sought to be subjected to taxation, for territorial and county purposes, by the plaintiffs in error, for the year 1896.

The first question involved for decision upon the record in this case, is, whether the property of defendants in error was subject to taxation by the Territory of Oklahoma and by the county of Greer, as a county of said Territory, for the year 1896. By secs. 1, and 3, art. 1, ch. 70, Laws of Oklahoma, 1893, all property, real and personal, except such as is expressly exempted by the provisions of sec. 2 of said article, is subject to taxation in the manner provided in said chapter. By sec. 12, art. 2, ch. 70, all personal property is to be listed, assessed and taxed in the county where the property may be situated and kept, on the 1st day of February.

The defendants in error admit that they were the owners of the personal property sought to be taxed, and that said property was situated and kept in the county of Greer on the 1st day of February, 1896, and it is not contended that it was property of the kind and character by law exempted from taxation; but they allege in their petition and contend here that said property was not situated or kept in any county in this Territory on the said first day of February, 1896; that the lands embraced in what is now Greer county, Oklahoma, on the first day of February, 1896, was not in the Territory of Oklahoma and constituted no part of the Territory of Oklahoma; that said Greer county, on said first day of February, 1896, and for a number of years prior thereto, was an organized county of the state of Texas; and that on said first day of February, 1896, the property of defendants in error was within the jurisdiction of the state of Texas and subject to taxation by said state and by the authorities of Greer county, as an organized county of said state, and not within the jurisdiction of, or subject to taxation by,

the Territory of Oklahoma, or by any county, of said Territory. It may be conceded that under ch. 70 of the laws of 1893, only such personal property as was within this Territory on the first day of February of any year, is subject to taxation for that year; and, therefore, the question is, was the property of defendants in error situated in legal effect within this Territory on the first day of February, 1896? The question of boundary between the United States and Spain, west of the Mississippi, had existed from the time of the acquisition of Louisiana by the United States in 1803; and by treaty between the United States and Spain, made February 22, 1819, and ratified February 19, 1821, (8 Stat. pp. 252, 254, 256,) such boundary was established but never definitely delineated or marked.

By the treaty of 1828, between the United States of America and the United Mexican States, concluded January 12, 1828, the dividing limits of the respective countries were declared to be the same as those fixed by the treaty of 1819. (8 Stat. 372.)

On the 25th of April, 1838, a convention was concluded between the United States and the republic of Texas, for marking the boundary referred to in the treaty of 1828, between the United States and the United Mexican States.

Since the establishment of the republic of Texas, there has been a controversy between the United States and the republic of Texas, and between the United States and the state of Texas as to the exact location of the boundary line fixed by the treaty of 1819, each party to such controversy asserting title to the lands now known as Greer county, in this Territory, under certain articles

of said treaty. By joint resolution passed March 1, 1845, congress consented that: "The territory properly included within, and rightfully belonging to, the republic of Texas," might be erected into a state to be admitted into the union. One of the conditions of such consent being that the new state be formed, subject to the adjustment by the United States of all questions of boundary that might arise with other governments. (5 Stat. 797.) The conditions prescribed were accepted by Texas. (1st Sayles Early Laws of Texas, art. 1531.) Texas was then admitted as one of the states of the union and afterwards, by act of congress, approved September 9, 1850, (ch. 49, 9, Stat. 446,) certain propositions were made to the state of Texas for the settlement of the controversy regarding the boundary in dispute between the United States and the state of Texas; but no definite settlement of such controversy was ever made and the state of Texas continued to exercise jurisdiction over the territory in dispute, first attaching the same for judicial and municipal purposes to one of the organized counties of said state, and, afterwards, in 1886, organizing the disputed territory as a county and creating the same as a county of said state, by the name of Greer county; and such was the condition when, in 1890, congress created the Territory of Oklahoma.

By sec. 1 of the act of May 2, 1890, establishing a temporary government of the Territory of Oklahoma, the boundaries of said Territory were so fixed and drawn as to include within said Territory the lands in controversy between the United States and the state of Texas and included as Greer county, Texas, and now included as Greer county, Oklahoma. But, by sec. 25 of said act of congress of May 2, 1890, it was provided:

"That, inasmuch as there is a controversy between the United States and the state of Texas, as to the ownership of what is known as Greer county, it is hereby expressly provided that this act shall not be construed to apply to said Greer county, until the title to the same has been adjudicated and determined to be in the United States; and, in order to provide for a speedy determination of the controversy aforesaid, the attorney-general of the United States is hereby authorized and directed to commence, in the name and on behalf of the United States, and to prosecute to a final determination, a proper suit in equity in the supreme court of the United States, against the state of Texas, setting forth the title and claim of the United States to the tract of land lying between the north and south forks of the Red river, where the Indian Territory and the state of Texas join, east of the 100th degree of longitude, and claimed by the state of Texas as within its boundaries and a part of its land, and designated on its map as Greer county, in order that the rightful title to said land may be finally determined."

On March 16, 1896, he supreme court of the United States, in an action brought by the attorney general under the authority of said act of congress, held and decided that the territory in dispute called Greer county, "Constitutes no part of the territory properly included within, or rightfully belonging to, Texas, at the time of the admission of that state into the Union, and is not within the limits nor under the jurisdiction of that state, but is subject to the exclusive jurisdiction of the United states of America." (*United States v. Texas*, 162 U. S. 1.)

What was the effect of this decision as determining the question when these lands came within the Territory of Oklahoma?

The decision holds that they constituted no part of the territory properly included within or rightfully belong-

ing to Texas at the time of the admission of that state
into the union, and never were rightfully within the
limits, or under the jurisdiction, of that state, but were
subject to the exclusive jurisdiction of the United States.
The contention that they passed into the Territory of
Oklahoma and were made subject to its jurisdiction by
the decision in that case, cannot be upheld. The passing
of territory from the United States to a state or territory
is a legislative and not a judicial function, and can be
exercised only by the congress of the United States. If
the lands embraced in Greer county are now a part of the
Territory of Oklahoma, they are such by virtue of the
act of congress approved May 2, 1890, and not by the
decision of the supreme court in the case cited; and such
lands were made a part of the Territory of Oklahoma on
the 2nd day of May, 1890, and not upon the 16th day
of March, 1896. As we construe the act, the purpose of
congress was to create a territorial government within
the territory, embraced within the boundaries fixed by
the first section of the act, but, recognizing the fact that
the state of Texas laid claim to a portion of the lands
embraced therein and was exercising jurisdiction over
the same; that a *de facto* government existed over the
disputed territory, congress provided that the functions
of the territorial government it was creating should
remain suspended until the controversy with the state
of Texas should have been judicially determined. In
other words, congress, by the act of May 2, 1890, in effect
said: These disputed lands belong exclusively to the
United States. By this act they are made a part of the
Territory of Oklahoma. They are now embraced within
its territory, but the functions of its government shall

not be exercised over them until the controversy between the United States and Texas shall have been adjudicated.

So far as the status of the lands were concerned, as between the United States and Oklahoma, they were fixed in and made a part of Oklahoma by that act, subject to defeat only by a decision of the supreme court that such lands belonged to the state of Texas and not to the United States, and when the decision in favor of the United States was made, that decision related back, so far as the Territory of Oklahoma was concerned, to the act of May 2, 1890, and made said lands a part of Oklahoma by that act. The fact that the territorial government could not exercise dominion over that territory or subject the people residing therein or their property to its laws, until the controversy between the United States and Texas had been adjudicated, does not argue that the lands were not in the Territory of Oklahoma, but, on the contrary, recognizes such lands as within the Territory but simply withholds the exercise, by the Territory, of governmental authority over them. The Territory did not attempt to exercise any dominion over persons or property in Greer county until after it was adjudicated that it was no part of Texas. The taxes in controversy were not sought to be assessed, levied or collected until after the decision of the question. At the time the Territory sought to assess and levy these taxes, the territorial government had complete jurisdiction over Greer county, and said Greer county was an organized county of this Territory. It is the duty of the territorial and county government to tax all property not exempt that was in the Territory and county on the 1st day of February of the year for which the taxes are sought to

be levied. The taxes are not in fact assessed in February, but at a later period in the year, and such assessment relates back to and affects whatever property was within the Territory on the 1st day of February.

We must hold that the territory now embraced in Greer county was, by the act of May 2, 1890, made a part of this Territory, and ever since that date has been a part of this Territory; that the laws of this Territory were, by said act, suspended until March 16, 1896, when they became fully operative in what is known as Greer county; and that all property in said county on the 1st day of February, 1896, was subject to taxation by this Territory and by Greer county, as a county of this Territory, for the year 1896.

The cases of *Comins v. Harrisville*, 45 Mich. 442; *Borland v. Boston*, 132 Mass. 89; *Morgan Co. v. Hendrix Co.*, 32 Ind. 234, and others to which we have been cited by counsel for defendants in error, are not analogous. Cases where a township is transferred from one county to another by an act of a legislature having authority to create, change or abolish counties, or where a county, by concurrent action of two states, is cut off of one state and incorporated into another, or where a person removes his property from one county to another or to a different state, do not involve principles in anywise analogous with the case at bar.

II. The defendants in error, in their petition in the court below, alleged that no meeting was held by the county commissioners of Greer county in July, 1895, to prepare an itemized estimate of the necessary expenses of the county during the ensuing year, (1896) and that no itemized estimate of the necessary expenses of the county for

the year 1896 was made during the year 1895, nor was
any statement made during said year 1895 of the amount
of revenue necessary to be raised, and no entry was made
on the record of the county commissioners of such esti-
mate, nor was any such estimate published in the year
1895, as required by law; and that no board of commis-
sioners met on the third Friday in July, 1895, or at any
other time in said year, to make a levy of taxes for the
year 1896; and counsel for defendants in error contend in
argument that such failure rendered absolutely void the
taxes levied and assessed for the year 1896. The answer
to this proposition is that even a casual reading of the
statutes would show such contention to be absolutely
without merit. The county commissioners were not re-
quired to make or publish any estimate in 1895 of the
amount of revenue necessary to be raised in the year
1896. The commissioners are required by sec. 3, art. 8,
chap. 70, Laws of 1893, as amended, Laws of 1895, page
217, at their regular meeting in July, of each year, to pre-
pare an itemized estimate of the necessary expenses of
the county during the ensuing year, and the rate of levy
necessary to raise such revenue for each fund separately;
such estimate to be entered upon their records and pub-
lished. By the words "ensuing year," as used in this sec-
tion, the legislature did not mean the next calendar year
but did mean the current year, because in the same sec-
tion they provide that the commissioners shall meet on
the third Friday in July and proceed to make the levy of
taxes for the ensuing year, and by other provisions of
the statute the taxes levied on the third Friday in July
are due and payable, one-half thereof, in December of the
same calendar year. The taxes levied for any fiscal year

are levied upon assessments made on the first Monday in February or as soon as practicable thereafter. The levies required to be made on the third Friday of July are to be in accordance with an estimate therefor made at the first meeting of the commissioners in the same month and, after publication of such estimate; and such levies are based upon an assessment made in the previous month of February, and the taxes thereby levied are one-half due and payable in the month of December following. So that nothing was required to be done in the calendar year 1895 to make valid any taxes assessed or levied during the calendar year of 1896.

Other contentions of defendants in error are, that the boards of equalization of the townships did not meet at the time prescribed by statute, for the equalization of taxes for the year 1896; that the county board of equalization did not meet at the time prescribed by statute, nor equalize the taxes of said county for said year as required by law; that the board of county commissioners did not exist under the laws of Oklahoma in said county until May 21, 1896; and that said board did not meet on the first Monday of June, as a board of equalization; that the various township assessors did not, on or before the first Monday in May, make out and deliver to the county clerk an assessment roll as required by law; that the county clerk did not make out an abstract of said assessment rolls, or any of them, as equalized and corrected on or before the third Monday in June; and that said clerk did not, on or before said date, transmit said assessment roll to the auditor of the Territory.

The petition of the defendants in error, while it alleges all these matters as invalidating the tax, does not deny

that the various boards and officers did, in fact, perform the duties required of them by law, though at a different time than that stated in the law.    In other words, it is not alleged that the assessments were not equalized by township boards of equalization, or that the returns from the various townships were not equalized by a board of county equalization, or   that the   county clerk did   not make an abstract of the assessments and forward the same to the auditor of the Territory, or that the territorial board omitted its duty in equalizing the assessments of said Greer county with the other counties of the Territory.   It is simply contended that these various acts were not done on the day or days specified for their performance by the statutes.

Counsel for the defendants in error have favored us with a very voluminous citation of authorities which it is contended hold that the provisions of the statute which requires particular proceedings to be taken in a particular manner for the assessment, levy or collection of taxes, also the provisions of the statute in relation to the time when such proceeding shall be taken, are mandatory, and, unless strictly followed, both as to manner and time, the taxes will be void.   Such, however, is not the holding of our own court.   In *Sharp v. Engle*, 2 Ok. 624, where under the statute, Laws of 1893, sec. 5627, which provides that the county commissioners must meet on the third Monday of July to levy taxes for the current fiscal year, but that such levy must not be postponed for more than ten days; and where it was admitted in the record that the levy was not made until the third day of August, and more than ten days from the third Monday in July, this court held that the collection of taxes thus levied could

not be enjoined from the mere fact that the levy was made a few days after the time provided by law. In *French v. Edwards*, 13 Wallace, 506, it is said:

"There are undoubtedly many statutory requisitions intended for the guide of officers in the conduct of business devolved upon them, which do not limit their power or render its exercise in disregard of the requisitions ineffectual. Such generally are regulations designed to secure order, system and dispatch in proceedings and by a disregard of which the rights of parties interested cannot be injuriously affected. Provisions of this character are not usually regarded as mandatory unless accompanied by negative words importing that the acts required shall not be done in any other manner or time than that designated."

In *Mills v. Johnson*, 17 Wis. 617, it was held that a statute requiring the assessors to return their assessment rolls to the common council of a city, on or before the 1st day of July of each year, and providing that on the first Monday in July, or within ten days thereafter, the common council should determine the amount of tax and levy the same, was directory as to time, and that the return of the assessment rolls in the month of August did not invalidate the tax or render the proceeding void.

Whatever may be the rule of decision in actions at law where title is sought to be supported, based upon tax proceedings, and where there has not been a compliance with the statute in such proceedings, either as to manner or time, we think an entirely different rule prevails where the action is a proceeding in equity to restrain the collection of the tax. Where a party invokes the powers of a court of equity to relieve him from the payment of a tax, he must not only show that there has been a departure in manner or time from the proceedings provided for the as-

sessment, levy or collection of the tax, or an omission in the procedure, but he must show that such departure or omission affects the ground work and substance of the procedure and affects the justice or merit of the claim on the part of the public, and affects injuriously his substantial rights. This action being a proceeding in equity, where equitable relief only is asked, will be governed by rules and principles prevalent in those courts where relief of that character is prayed. Among those rules having application here is this, that: "He who seeks equity must do equity," and means simply this: that where a complainant comes before a court of conscience, invoking its aid, such aid will not be granted except upon equitable terms; these terms will be imposed as the price of the decree it gives. The rule, "decides nothing itself," for you must first inquire what are the equities which the plaintiff must do in order to entitle him to the relief he seeks: (*Hanson v. Keating*, 4 Hare 1; *Phillips v. Phillips*, 50 Mo. 603; *Kline v. Vogle*, 90 Mo. 239; *Erwin v. Blake*, 8 Pet. 18; Story Eq. Jur. sec. 643, 10.)

The plaintiffs in this case, waiving their first proposition that the property was not subject to taxation, do not complain in their petition that the irregularities of which they complain resulted in any substantial injury or any injury to them; they do not complain that such irregularities increased in any particular the taxes, or imposed any burden upon them that would not have been imposed if everything had been done in manner and time as provided by the statute. Their property was not, in fact, assessed or its value fixed for taxation by any officer of government. They made voluntary returns of the amount and value of their property, and such amount or value

was not changed in any particular by any officer or board; the taxes complained of were levied upon the property returned by them and upon the valuation of such property, fixed by themselves.   When such taxes were assessed and levied, their property was within the jurisdiction of this Territory, receiving the benefit of the protection of its laws.   It had not been taxed in any other jurisdiction.   It was subject to taxation here, and subject to pay its proper tribute to the government from which it was receiving protection, and therefore, in equity and good conscience, before they can invoke the powers of a court of equity, they should do equity; that is, pay or tender all such taxes as in justice and right they ought to pay; and, in the absence of a showing that the defendants were endeavoring to collect more than in justice and right should be demanded, there is no equity in their case.   To grant what is contended for by defendants in error would be to change the principles of equity jurisprudence and make of it a system for the enforcement of arbitrary and inflexible rules of law, without conscience and with no regard for substantial right.

We are not without authority in support of these propositions.   The supreme court of Kansas has many times held that a court of equity will not lend its aid by injunction to restrain the collection of taxes because of mere irregularities in the tax proceedings and which did not injure the substantial rights of the citizens or taxpayers. (*Railway v. Russell*, 8 Kan. 558; *Parker v. Challis*, 9 Kan. 155; *Smith v. Commissioners*, 9 Kan. 296; *City of Lawrence v. Killam*, 11 Kan. 499; *Challis v. Commissioners*, 15 Kan. 49.)

To the same effect see: *Warden v. Supervisors,* 14 Wis., 618; *Wingate v. Ketner,* (Wash.) 35 Pac. 591.

As the court below sustained a demurrer to the answer of the defendant and rendered judgment for the plaintiffs upon their petition, it follows from what we have said that the court erred therein; that the demurrer should have reached back and searched the petition and should have been sustained as to said petition because no cause of action is stated therein.

The judgment of the court below is reversed and the cause is dismissed.

Keaton, J., having presided in the court below, not sitting; all the other Justices concurring.